JUDGE PAULEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 CV 4548

------------------------------------------------------------X

THE HANOVER INSURANCE COMPANY,

Plaintiff,

- against -

SMITH BROTHERS INSURANCE, INC. and
JAMES BARTLETT NELSON,

Defendants.

------------------------------------------------------------



COMPLAINT

RECEIVED
JUN 11 2012
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff The Hanover Insurance Company ("Hanover"), by its attorneys, Torre,

Lentz, Gamell, Gary & Rittmaster, LLP, for its complaint against the defendants, alleges

as follows:

## NATURE OF THE ACTION

1.      Hanover seeks to recover in excess of $8.5 million in damages suffered as

the result of acts, errors and omissions committed by the defendants – insurance agency

Smith Brothers Insurance, Inc. ("SBI") and insurance agent James Bartlett Nelson

("Nelson") – in connection with a series of surety bonds issued by Hanover on behalf of

Citadel Construction Corp. ("Citadel").

2.      Known to SBI and Nelson but not disclosed to Hanover during the

underwriting of the Citadel account was that Citadel was owned and controlled by Daniel

Gordon ("Gordon"), a convicted felon, who had caused Citadel to be incorporated in

2006 while incarcerated at Leavenworth Federal Penitentiary for admittedly embezzling

$43 million from his former employer.  Upon his release from prison in 2007, Gordon

assumed direct executive control of Citadel and contacted Nelson, who Gordon knew from prior dealings, to arrange a surety bond program for Citadel. Over the next several months, Nelson and other employees of SBI's bond department exchanged hundreds of emails with Gordon for purposes of preparing the submission of the Citadel account to Hanover and determining how they should respond to questions from Hanover's underwriters. In preparing the submission to Hanover and responding to Hanover's questions regarding the submission, Nelson and other employees at SBI never communicated with anyone at Citadel other than Gordon. As Nelson and SBI knew or should have known, the submission and responses were replete with misstatements and falsehoods, and failed to disclose to Hanover information that was material to Hanover's consideration of the Citadel account.

3.     Nelson was fully aware of Gordon's criminal background and knew that Gordon was "radioactive" to Hanover, meaning that Hanover would not agree to issue bonds on behalf of any entity with whom it knew Gordon was involved. Hanover had previously sought assurances from Nelson that Gordon was no longer involved with two other construction companies that, prior to Gordon's incarceration, had obtained bonds from Hanover through SBI. In submitting the Citadel account and subsequent bond requests to Hanover for consideration, Nelson and SBI repeatedly concealed Gordon's involvement with Citadel from Hanover's underwriters and breached their contractual and common law duties to speak truthfully and to disclose material facts and information known to SBI and Nelson regarding the risk.

4.     SBI and Nelson's specific acts, errors and omissions included: (a) failing to disclose to Hanover that Gordon's personal financial statement (which Gordon had emailed Nelson on December 19, 2007) reflected that Gordon owned Citadel's stock valued at $2 million, (b) concealing from Hanover that, during a telephone call with Hanover's underwriters ostensibly set up to address various questions Hanover had about the proposed Citadel account, Gordon was (with Nelson's full knowledge) impersonating the President of Citadel, David Stack ("Stack"), (c) causing Gordon to remove his name from the Contractor Questionnaire submitted to Hanover as part of the initial underwriting of the Citadel account, (d) redacting Gordon's name from a draft Citadel contract before delivering it to Hanover for review, and (e) generally concealing Gordon's involvement with Citadel and leading Hanover to believe that Stack was the source of the information about Citadel provided by Nelson to Hanover, when Gordon was actually the source.

5.     By concealing Gordon's involvement with Citadel from Hanover, SBI and Nelson deprived Hanover of the opportunity to consider all material and relevant information regarding Citadel.  Had Hanover known of Gordon's involvement with Citadel, Hanover would not have issued any surety bonds on behalf of Citadel and would not have incurred the losses on those bonds that eventuated.

6.     In addition to concealing Gordon's involvement with Citadel, SBI and Nelson failed to disclose, or misrepresented, to Hanover other material facts and information in breach of their contractual and common law duties.  These specific acts,

errors and omissions included: (a) failing to advise Hanover of the true nature of the transaction underlying a $4.9 million performance bond and then executing a suspect bond rider for that bond without obtaining authority from Hanover, (b) obtaining a suspect indemnity agreement purportedly executed by Citadel and two individual indemnitors in favor of Hanover, (c) misrepresenting who owned, or the ownership of, Citadel, (d) misrepresenting the dollar value of contracts completed by Citadel, (e) understating Citadel's backlog of work, (f) misrepresenting that Citadel had "no risk" on certain unbonded contracts when Citadel was actually an "at risk" general contractor, (g) manipulating Citadel's financial statements, and (h) misrepresenting that a project (139 Centre Street) was substantially complete when it was not.

7.     In reliance upon the facts and information supplied by SBI and Nelson, including material misrepresentations by SBI and Nelson in response to questions asked by Hanover's underwriters, Hanover issued surety bonds in connection with nine Citadel contracts. Ultimately, Citadel ceased operations due to Gordon's diversion of Citadel's funds to himself and his other businesses, causing Citadel to default on eight of the bonded contracts. Hanover has suffered losses and incurred expenses in excess of $8.5 million in discharging its obligations under the bonds issued on behalf of Citadel, and Hanover continues to have additional exposure under its bonds.

## THE PARTIES

8.     Plaintiff Hanover is a corporation organized and existing pursuant to the laws of the State of New Hampshire, maintaining its principal place of business at 440 Lincoln Street, Worcester, Massachusetts 01653.

9.     At all relevant times, Hanover has been authorized by the New York State Department of Insurance or its successor, the New York State Department of Financial Services (collectively, "DFS"), to issue surety bonds in the State of New York.

10.     Defendant SBI is a Connecticut corporation with its principal place of business located at 68 National Drive, Glastonbury, Connecticut 06033.

11.     SBI has been licensed in New York State by DFS as a Property and Casualty Insurance Agent since March 4, 2004.

12.     Defendant Nelson is a resident and citizen of Connecticut with a principal place of residence at 24 Kettle Pond Lane, Granby, Connecticut 06035.

13.     Nelson has been licensed in New York State by DFS as a Property and Casualty Insurance Agent since June 24, 2005.

14.     Nelson has been employed by SBI as its "Director of Surety" since April 1, 2004, and became a non-voting minority shareholder of SBI in 2008.

15.     Upon information and belief, at all relevant times, Nelson was in charge of SBI's "Bond Department" and the personnel in that department reported to Nelson.

16.    Unless otherwise specifically identified below, all errors, acts and omissions alleged to have been committed by SBI were performed by Nelson in his capacity as SBI's Director of Surety. Pursuant to the doctrine of respondeat superior, SBI, as employer, is liable for the torts committed by Nelson and the other identified employees of SBI's bond department because those torts were within the scope, and made in furtherance, of their employment.

## JURISDICTION

17.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as complete diversity of citizenship exists between Hanover and all defendants and the matter in controversy exceeds the sum of $75,000, exclusive of interest, costs and attorneys' fees.

## VENUE

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) as a substantial part of the events and omissions giving rise to this claim occurred in this District, the construction projects for which the bonds were issued were located in this District, the bonds were delivered to obligees in this District, Hanover's payments as a result of Citadel's defaults were made to obligees in this District, and Citadel's main office was in this District.

## COMMON ALLEGATIONS

### I. Hanover and SBI Entered into an Agency Agreement

19.     At all relevant times, Hanover was, and still is, one of the leading issuers of surety bonds in the United States, consistently earning high marks for financial strength, including an "Excellent" rating from A.M. Best Co.

20.     At all relevant times, SBI was, and still is, a full service insurance and financial services organization founded in 1971. According to its website, SBI has a "Bond Department", which provides services to its construction industry clients, including financial analysis, consultation prior to annual or interim meetings with sureties, bond form and contract review, prequalification assistance and assistance with requests for all types of surety bonds. SBI's website also contains a specific section for "new client[s] wishing to obtain bonding" and requires that those clients provide SBI with, inter alia, the following information: three years of CPA prepared financial statements, work in progress with open and closed job schedules, personal financial statements for all owners, a completed contractors questionnaire, bank line of credit information and resumes of key personnel.

21.     Hanover and SBI entered into an Agency Agreement with an effective date of January 1, 2005 ("Agency Agreement").

22.   Under the Agency Agreement, SBI and its authorized personnel became agents of Hanover, subject to the terms, conditions and limitations set forth in the Agency Agreement and applicable law.

23.   The Agency Agreement applied to surety bonds as well as various lines of insurance for which SBI acted as an insurance agent for Hanover.

24.   At all relevant times, Nelson, as an authorized representative of SBI, was an agent of Hanover pursuant to a certificate of appointment filed with DFS.

25.   Under the "Schedule of Authority" attached to and made a part of the Agency Agreement, SBI, as agent for Hanover, was entitled to "act as a representative of [Hanover] in negotiating, servicing or effecting policies of insurance issued in the name of [Hanover]" for personal and commercial lines of insurance and fidelity and surety bonds in several jurisdictions, including New York.

26.   Under the Agency Agreement, SBI was (a) to act as Hanover's representative and fiduciary in negotiating, servicing or effecting insurance policies, including surety bonds, (b) to act in accordance with Hanover's underwriting rules and practices, (c) to present potential surety accounts to Hanover and assist in the evaluation of those accounts, (d) to issue surety bonds and related documents pursuant to powers of attorney issued to SBI's authorized employees, if authorized to do so by Hanover, up to SBI's $20 million limit of authority (as confirmed in the powers of attorney), (e) to collect, account for and remit to Hanover all premiums and/or other monies paid to SBI

in connection with Hanover policies and surety bonds, accepting as its sole compensation commissions in an amount stated in a schedule of commissions, and (f) to comply with applicable laws, rules, regulations and other requirements affecting SBI's business, among other duties.

27.    For calendar years 2008 and 2009, Hanover issued surety bonds for SBI's accounts that generated in excess of $1 million of commissions for SBI in each year.

28.    The Agency Agreement specifically provided, at § 2.1, that SBI was "responsible for notifying [Hanover] of any additional information you acquire that, to the best of your knowledge, affects the rating of the risk."

29.    By reason of their agency relationship with Hanover, SBI and its authorized employees, including Nelson, were required to place Hanover's underwriters in the same position as SBI itself with respect to all information bearing on Hanover's potential risk, so that Hanover's underwriters would have the same means and opportunity to evaluate the risk as did SBI.

30.    SBI was, at all relevant times, a member of the National Association of Surety Bond Producers ("NASBP"), a national trade association of professional surety bond producers. NASBP requires that its members affirm their commitment to the NASBP code of ethics, which, upon information and belief, at the relevant time, provided, in part, as follows:

5.01 Surety bond producers shall maintain objectivity and integrity in the rendering of their services and shall not knowingly misrepresent facts.

5.02 Surety bond producers shall provide all relevant information needed to support the submission which they present to underwriters. Producers shall not knowingly withhold negative information even if the underwriters do not ask for it.

II. Nelson's Relationship with Gordon and Knowledge of Gordon's Crimes

31.     On December 19, 2003, Gordon pleaded guilty in the United States District Court for the Southern District of New York (Gerard E. Lynch, Judge) to three counts contained in a criminal information (the "Information") charging him with defrauding his employer, Merrill Lynch Capital Services, Inc. and Merrill Lynch & Co. ("Merrill Lynch") of approximately $43 million through an elaborate scheme involving payment for a fraudulent insurance policy.  Count Three of the Information had charged Gordon with conspiring to falsify Merrill Lynch's books and records in connection with the sale of its energy trading unit to make it appear more profitable to potential purchasers.

32.     According to the Information, on or about January 8, 2001, Allegheny Energy Services Corporation had acquired Merrill Lynch's energy trading unit and formed a new entity called Allegheny Energy Supply Company, LLP ("Allegheny"). Gordon was the president of Allegheny until September, 2002 when he was fired based on allegations of conflict of interest involving contracts that Gordon caused Allegheny to enter into with one or more companies he owned or controlled through the "Eastern Energy" companies.

33.     One of the "Eastern Energy" companies owned or controlled by Gordon was a Connecticut based construction contracting business named Eastern Energy Services, Inc. ("EES"), which Gordon had formed in November, 2001.

34.     Upon information and belief, Nelson, who was then employed by another Connecticut insurance agency, Arthur A. Watson & Co. ("Watson"), had been introduced to Gordon in or about 2001 and had begun assisting EES in obtaining surety bonds at that time.  Nelson knew that Gordon, or one of his entities, owned EES.  Nelson also obtained policies of personal insurance for Gordon.

35.     Upon information and belief, Nelson knew that in October, 2003 Gordon had agreed to sell EES, obtaining a security interest in the assets of EES until the agreed purchase price had been paid in full over the following three years.

36.     Nelson was aware of Gordon's crimes, which Nelson disclosed to a surety underwriter (not at Hanover) in a January 21, 2004 letter: "As you may recall, this account [EES] was owned by Dan Gordon, the wealthy young trader from New York City who decided he wanted to be an HVAC contractor. Dan hired a strong management team which ran the operation. Dan was ultimately indicted for some suspect transactions on Wall Street. Dan sold EES to his management team and has moved back to New York to address his legal issues."

37.     Upon information and belief, in 2003 Gordon loaned approximately $700,000 to assist David McWilliams ("McWilliams") in the formation of another

construction company, McWilliams Construction, LLC, where Gordon began working as an executive when he returned to New York and where he continued to work until he was remanded to prison in December, 2005.

38.     In or about January, 2004, Stack acquired 50% of McWilliams Construction, LLC.  The corporation changed its name to Stack McWilliams, LLC and later to Stamack Construction, LLC ("Stamack").

39.     Upon information and belief, Gordon had met McWilliams and Stack when they both worked at Lehr Construction and were involved in a construction project that Lehr performed for Allegheny.

40.     Following Nelson's move from Watson to SBI, SBI became "agent of record" for both EES and Stamack in April, 2004, and Nelson began assisting both EES and Stamack in obtaining surety bonds from Hanover.  Gordon was Nelson's primary contact at Stamack.

41.     In October, 2005, Nelson emailed Gordon: "I read an article in the [New York] Times that outlined what you are facing.  I am sorry to hear about this.  Moving forward is there someone at Stamack that I should communicate with."  The article from the New York Times disclosed that Gordon "was sentenced to three and a half years in prison yesterday for stealing $43 million from [Merrill Lynch].  Mr. Gordon, 29, pleaded guilty in Federal District Court in Manhattan in late 2003 to charges of wire fraud, money-laundering and conspiracy to falsify books and records."

42.   Accordingly, Nelson was aware of Gordon's crimes, which included stealing $43 million and falsifying books and records. Despite this knowledge, Nelson continued his affiliation with Gordon, including providing assistance in procuring surety bonds for companies with which Gordon was deeply involved.

III. Hanover Sought Confirmation that Gordon Not Involved with Bonded Companies

43.   In two emails to Nelson, Hanover had advised SBI that Hanover was unwilling to issue surety bonds for a company in which Gordon was involved, whether as an owner or otherwise:

(a)   On May 18, 2005, Curt Johnson ("Johnson"), a "Regional Bond Manager" for Hanover, emailed Nelson after noting that Gordon had signed a document as "duly authorized manager" of Stamack: "it was and still is my understanding that Dan Gordon is no longer involved, ownership or otherwise, with Stamack Construction and/or Stamack, Inc." Nelson responded: "Curt – I will call Dave Stack tomorrow and discuss this with him." In fact, Nelson did not contact Stack. Stack had ceased working at Stamack in late 2004 and had been bought out for $315,000 in March, 2005, facts known to SBI. Upon information and belief, Nelson was also aware that Gordon or one of his entities had acquired Stack's 50% interest in Stamack.

(b)   On May 24, 2005, Johnson emailed Nelson: "Jim - for reasons we have previously discussed, I need your confirmation that Mr. Dan Gordon is no longer involved (ownership or otherwise) with Stamack Inc. and/or Stamack Construction, Inc.; please confirm – Curt".

44.     The foregoing emails were contained in Stamack's underwriting file and were known to Johnson's successor at Hanover, Adam Wright ("Wright") and Wright's supervisors in the underwriting department.

IV. Nelson Concealed Gordon's Involvement with Stamack from Hanover

45.     Throughout 2005, prior to his incarceration, Gordon remained deeply involved with Stamack, as Nelson knew from his frequent communications with Gordon.

46.     Nelson concealed Gordon's involvement with Stamack from Hanover. For example, in September, 2005, Gordon requested that Nelson procure a lien discharge bond for Stamack. In response to Nelson's request that Hanover approve the bond, Johnson requested copies of the subcontract and of Stamack's letter defaulting the subcontractor that had filed the lien.

47.     At Nelson's request, Gordon faxed the two documents to SBI. Jan Drury ("Drury"), an employee of SBI in the Bond Department, emailed Nelson: "Dan [Gordon] is the person who wrote the [default] letter." Nelson replied: "Don't send the letter but send the other info and ask Curt [Johnson] to start working on this. Let him know we will get the letter he is looking for on Monday." Nelson further replied: "Does Dan appear anywhere else?" Drury responded: "I faxed over the contract to Curt, not the letter as it was signed by Dan. ... Luckily the contract was signed by David McWilliams as Managing Partner."

48.     Nelson and Gordon then exchanged emails. Gordon: "The letter sent to Stamacks [sic] sub was signed by you.  Is there anything that was sent and signed by someone else?" Gordon: "No – but if you need me to, I can have the letter redone and signed by someone else." Nelson: "No. We will leave as is".  The bond was issued on September 27, 2005 without SBI ever disclosing to Hanover Gordon's continuing role at Stamack or that Gordon had signed the default letter.

49.     In addition to Johnson's emails requesting confirmation that Gordon had no further involvement with Stamack, Johnson emailed Nelson on March 27, 2006 seeking similar confirmation regarding EES, asking whether the sale had "been 100% consummated with D. Gordon no longer involved with the companies?"  Nelson responded on March 29 that "D. Gordon has no affiliation with EES".  Thereafter, Johnson confirmed to another Hanover employee on April 7, 2006 that the "prior owner D. Gordon is now completely out of the picture."  Again, Hanover made it clear to Nelson that Hanover wanted nothing to do with a company in which Gordon was involved.

## V. Nelson's Knowledge of the Formation and Makeup of Citadel

50.     On October 2, 2006, while Gordon was serving time at Leavenworth Federal Penitentiary, Nelson received an email from F. Robert LaSaracina ("LaSaracina"), a CPA who had been working for Stamack at the behest of Gordon: "Jim, it is not official yet but it appears [Stamack] will split up whereby Dan [Gordon] takes

Stamack USA and Dave [McWilliams] keeps the balance." Nelson forwarded the email to Bette Botticello ("Botticello"), an employee in SBI's Bond Department.

51.     On October 9, 2006, Nelson emailed LaSaracina: "Bob- I was surprised to receive a letter from Leavenworth KS. Apparently this is where Dan [Gordon] is 'staying'. The letter explained the planned spin off of Stamack USA...my hope is that it will have sufficient WC [working capital] and Equity to qualify for bonds should they be necessary...[i]t would appear that the new entity will be owned by Ed Romero, Ed Hassankhani and another entity. I will need a contractors questionnaire as well as corporate and personal financials in order to begin arranging a bond program for Stamack USA."

52.     Upon information and belief, Nelson knew that the "other" owner entity was either Gordon himself, or a Gordon owned entity, and that the "spin off" was Citadel.

53.     Pursuant to a Certificate of Incorporation filed with the State of Delaware on October 26, 2006, Citadel was purportedly formed by Edward Romero ("Romero"), identified on the certificate as the director of the corporation. Upon information and belief, Romero was acting at the behest of Gordon, who was in prison at the time.

54.     Upon information and belief, in November and December, 2006 Gordon caused his wife to deposit a total of $1,450,000 of Gordon's funds into Citadel's bank account to capitalize Citadel.

55.   In mid-2007, SBI exchanged communications with Citadel personnel regarding obtaining surety bonds for the "Flair" project in California. Nelson and other employees of SBI requested and received various underwriting information from Citadel, through Gordon's brother-in-law John Lesnick, including Citadel's brochure (which identified only Romero and Hassankhani as "principals") and a "Contractor Questionnaire" which identified Romero as the President and 100% owner of Citadel. Citadel appointed SBI as "Agent of Record" in a June 6, 2007 letter signed by Romero, as Principal. Ultimately, SBI did not procure the bonds for Citadel for the "Flair" project.

56.   The underwriting information provided by Citadel to SBI and the earlier October, 2006 communications from LaSaracina and Gordon to Nelson made no mention of any affiliation between Citadel and Stack.

57.   Upon information and belief, Stack had no involvement with Citadel until he was hired by Gordon in November, 2007. Sometime thereafter, Stack became the "President" of Citadel, although Gordon continued to control all aspects of Citadel's business.

VI. Gordon Contacted Nelson to Procure Bonds

58.   Upon his release from prison in November, 2007, Gordon began working at Citadel on a work release program, and assumed control over Citadel's affairs, including check signing authority, approval of invoices for payment and the hiring of personnel.

59.    Almost immediately, Gordon contacted Nelson seeking his assistance in obtaining surety bonds for Citadel.  On December 8, 2007, Gordon emailed Nelson with the subject line "Citadel Construction Corp.":

> Jim:
>
> I hope this note finds you well.  I am writing to inquire as to your interest in doing insurance/bonding related work for Citadel.  By way of background, Citadel is 13 months old.  In its first year, it had revenues of $12 million with a small loss attributable to start up expenses.  Current backlog is over $100 million including some major projects for high profile clients in NY, NJ and California.  The Company has a solid senior management team including Dave Stack as a principal and Chris Kuntz (11 years at Lehr Construction) as its Director of Construction.  Ed Romero remains involved and I am in the "background" assisting in sales and related matters.  the company has retained Eisner as its outside auditor and should have an audit report sometime in March.  Shareholder Equity is about $1.6 million and there is credit line in place with Signature Bank.
>
> From time to time, Citadel is asked to post a surety bond and the time has come to establish a surety program.  I wanted to inquire as to your interest in handling the account.  Please let me know.  I hope all is well.
>
> Dan

60.    The following day, Nelson responded: "[i]t is good to hear from you.  I am interested in speaking with you relative to Citadel and their anticipated surety needs." Gordon emailed his contact information at Citadel, including his Citadel direct office telephone number and email address.

61.    Throughout December, 2007, Nelson and Gordon continued to exchange emails regarding a potential bonding program for Citadel.  On December 18, Gordon

emailed Nelson: "I trust you got the internal financials. I have a couple of jobs coming up that may need bonds. What else do we need to 'qualify' for bonds?"

62.     Nelson responded: "<u>I also need the personal financial statement for the owner(s)</u> as well as a current insurance certificate. Do you have a projection for year end? *** Upon receipt I will review and then call." Gordon: "I'll get you the info this week. *** <u>Do you want my financial or is it better for me to "stay in the closet"</u>?" Nelson: "<u>Send the requested information</u>. *** <u>We can discuss your level of involvement later. One other piece of information is the Contractor's Questionnaire</u>, which I will email to you in the morning." [Emphasis added].

(a) <u>Nelson's Failure to Disclose Gordon's PFS</u>

63.     In response to Nelson's request for "the personal financial statement for the owner(s)" of Citadel, Gordon emailed <u>only</u> his own personal financial statement ("PFS") to Nelson on December 19, 2007.

64.     Gordon's PFS disclosed financial information as of December 13, 2007, including that Gordon owned 200 shares of Citadel Construction with a market value of $2 million.

65.     Upon information and belief, Nelson reviewed Gordon's PFS at the time of receipt and thereafter emailed it to Botticello, an employee in SBI's Bond Department.

66.     Despite receiving Gordon's PFS that confirmed Gordon's ownership interest in Citadel, Nelson failed to disclose Gordon's PFS or the information contained within it to Hanover.

(b) <u>Nelson Participated in Misrepresenting Information in Contractor's Questionnaire</u>

67.     Nelson assisted Gordon in preparing at least four iterations of the standard NASBP form of Contractor's Questionnaire on behalf of Citadel. Nelson provided <u>only</u> the last version to Hanover. Each successive iteration manipulated and/or misrepresented certain information. The "revisions" included the following:

• First Version: on December 26, 2007, Gordon emailed Nelson the "completed Questionnaire" and requested from Nelson "what, if any, additional information is required." This first version identified Gordon as the "contact" for Citadel and provided Gordon's email address (dgordon@citadelcc.com); it listed as the corporate "officers, partners or proprietors" of Citadel only Romero and Mohammad Hassankhani ("Hassankhani") without identifying their respective ownership percentages as requested; it did not identify Stack as an "officer, partner or proprietor", but rather as a "principal" under "additional personnel key to your operations", and it indicated it was "completed by" Gordon who was also the anticipated signatory of the form.

• Second Version: on December 28, 2007, Nelson emailed Gordon seeking modifications to the Questionnaire: "[i]t seems appropriate for Dave Stack to be listed under Ed Romero and Mohammad's names as principal. The 'contact name' should probably be a principal...maybe Ed or David." Gordon returned the second version of

the Questionnaire, changing the contact and proposed signatory from Gordon to Romero, adding Stack's name to the list of corporate officers, partners or proprietors of Citadel, and removing Stack's name from the list of key personnel (since Stack was now identified as an "officer, partner or proprietor"). Upon information and belief, Nelson never sought to confirm any of this information with Stack or anyone else at Citadel other than Gordon.

• Third Version: on January 3, 2008, Gordon emailed a third version of the Questionnaire to Nelson "with requested information", which supplemented the "experience and references" section by providing additional information on five of Citadel's largest contracts.

• Fourth Version: the last version of the Questionnaire (the "Final Questionnaire") was the version ultimately provided to Hanover in late January, 2008 and contained several material misstatements of fact that were either known or should have been known to be false by SBI and Nelson.

68. Accordingly, through the various iterations of the Questionnaire, Nelson caused Gordon to remove Gordon's name from the Questionnaire to conceal his involvement from Hanover. In addition, Nelson failed to disclose to Hanover that Stack was initially identified only as part of Citadel's "key personnel" and not as an "officer, partner or proprietor" of Citadel. (Other misrepresentations concerning the Final Questionnaire will be discussed below.)

VII. SBI's Submission of Citadel to Hanover Was Replete with Misstatements

69.     In January, 2008, Nelson emailed Wright of Hanover regarding a new potential account that required surety bonds for a $17 million project.

70.     On or about January 25, 2008, after receiving information regarding Citadel exclusively from Gordon, Nelson submitted a letter to Wright formally introducing the potential Citadel account ("Letter of Introduction"). The letter attached the Final Questionnaire, various financial statements and other documents.

71.     The Letter of Introduction stated, in part, as follows:

*** Citadel Construction is a spin-off from a previous account of mine, Stamack Construction. In fact, all of the individuals that I knew and caused me to bond and support Stamack are now at Citadel. *** The current project which does need a bond, is the renovation fitout of 139 Centre Street in NY. The owner is Young Woo Associates, a large developer with projects around the country. Citadel has a close relationship with YWA, in fact, one of the owners is the Godfather to the daughter of one of the principals of Citadel. *** The final pricing is being negotiated, but the contract price looks to be approximately $17.5 million. *** My recommendation for Citadel is bond by bond handling. Our consideration will be supported by the personal indemnity of the principals, corporate indemnity, annual audits, six month CPA compilations or reviews if needs grow and quarterly in-house WIP's. *** In light of the private, negotiated CM nature of the job for a friendly owner, I am in complete support of bonding this project. *** I know and respect the CPA with whom I have several mutual Connecticut contractors, as well as the team at Citadel."

72.     As set forth in the Letter of Introduction, Nelson was requesting that Hanover issue bonds for Citadel in connection with a project known as 139 Centre Street in Manhattan. The project was for conversion of a building to retail and condominium office suites. Nelson stated that he was "in complete support of bonding this project."

73.   Ultimately, Hanover issued bonds for the 139 Centre Street project in the penal sum of $22,950,467.

74.   The Letter of Introduction and the attached Final Questionnaire contained numerous material misrepresentations, which were false, known by SBI and Nelson to be false, or which should have been known by them to be false.

(a)   Misrepresentation of the Ownership of Citadel

75.   The Final Questionnaire stated that the three owners (or "proprietors") of Citadel were Edward Romero, Mohammad Hassankhani and David Stack.  The space on the Questionnaire requesting "percent owned" of Citadel was left blank by SBI when the form was submitted to Hanover.

76.   Upon receiving Nelson's Letter of Introduction and Final Questionnaire, Wright of Hanover emailed Nelson on January 31, 2008: "what is the ownership % of Citadel?"  Nelson responded: "Good question.  I sent Dave [Stack] an email this morning. I think it is 50 (Dave) 25 & 25 but I am just guessing."  Nelson did not email Stack but rather emailed Gordon on the same day: "Dan – ownership percentage for Citadel Ed, Mohammed(?), Dave?"  Gordon responded: "Very tricky question…" [Punctuation and ellipses in original].

77.   Later on January 31, Nelson emailed the following ownership percentages to Wright: "70% Stack, 20% Romero, 10% Mo."

78.     Nelson knew or should have known that the information he provided to Wright was false, as Nelson had Gordon's PFS confirming Gordon was the owner of Citadel.

79.     Nelson never confirmed the alleged ownership percentages directly with Stack or Romero or Hassankhani, and instead emailed Gordon despite falsely advising Wright that he had sent an email to Stack.

(b) Misrepresentation Regarding Citadel's Line of Credit

80.     The Final Questionnaire stated that Citadel had a $1.5 million line of credit from Signature Bank.

81.     Following his receipt of the Letter of Introduction, Wright requested confirmation from Nelson of the alleged credit line.  On February 4, 2008, Nelson emailed Wright: "Citadel's banker is out until Wed. however attached please find a recent 'bank verification form' that Signature completed on 1/9/08. As you can see line is 1.5mm and they are considered a 'excellent, high valued client' per the banker. Cash balance in Citadel was approx 3mm (cash & Money market) with no use of the line." The attached "form" had been provided to Nelson by Gordon.

82.     Upon information and belief, the form contained materially false information and was not completed by an authorized representative of Signature Bank. Nelson failed to inform Wright that Gordon was the source of the form and, upon information and belief, Nelson never sought to contact Signature Bank or to otherwise

verify the existence of the line of credit which, upon information and belief, was at most $250,000, not the $1.5 million that Nelson represented to Hanover.

(c) SBI's Failure to Disclose Citadel's Other Bond

83.     In response to a request in the Final Questionnaire for the names of "Previous Bonding Companies", the Questionnaire stated "ACSTAR", which was a reference to ACSTAR Insurance Company.

84.     SBI failed to disclose that, on January 15, 2008, only ten days before formally introducing the potential Citadel account to Hanover, SBI had obtained for Citadel a "Taxpayer Bond for Contractor" from Platte River Insurance Company ("Tax Bond"). Gordon had emailed Nelson seeking the Tax Bond, because "We need it to register with the State of Arizona for Sales Tax". Nelson did not seek to obtain the Tax Bond from Hanover.

85.     Upon information and belief, Nelson failed to disclose to Hanover the need for or existence of the Tax Bond because Nelson did not want Hanover to learn that Citadel was operating in Arizona, as Hanover might deem Citadel to be over-extended, thus imperiling Nelson's attempt to have Hanover bond the 139 Centre Street project.

86.     SBI had previously obtained a similar tax bond for Stamack from a surety other than Hanover, at which time Nelson stated to SBI employee Jan Drury that Hanover's underwriter "will get uptight if he sees that they are doing work in Arizona."

87.    When the time came to renew the Tax Bond for Citadel, Abigail Fay ("Fay") of SBI's Bond Department emailed Drury that issues had arisen with the surety on the Tax Bond. Fay asked: "Would you like me to move it Hanover or something?" Drury responded: "Yes will likely have to do it elsewhere. Although that may raise questions with adam [Wright]. Since its Arizona. Let me think on this one."

88.    SBI never contacted Hanover about Citadel's need for the new Tax Bond.

(d) <u>SBI's Misrepresentation in Inflating Two of Citadel's Largest Contracts</u>

89.    In response to a request in the Final Questionnaire to "List five of your largest contracts", the Questionnaire listed as the first two contracts New York 1 News with a contract price of $1,348,116.53 and Major League Baseball with a contract price of $1,888,060. In addition, there was a footnote regarding these two contracts stating: "Contact Price represents fee. Actual contracts were approx. $10m Pure CM/Advisor".

90.    Upon information and belief, this footnote (a) was inserted by SBI and <u>not</u> by Gordon, and (b) was false.

91.    Citadel's actual Major League Baseball contract was for only $188,806 and not for $10 million as represented in the footnote. In addition, Citadel was a general contractor for the contract and <u>not</u> a construction manager (or "CM").

92.    Citadel's New York 1 News contract was for $1.3 million and not for $10 million as represented in the footnote. Citadel also completed this contract as a general

contractor. In addition, the New York 1 News contract was not even included in the initial version of the Questionnaire provided by Gordon to Nelson.

93. SBI knew or should have known that the content of the footnote was false.

94. Upon information and belief, SBI inflated the values of these two contracts in an attempt to establish that Citadel had the capacity to perform large multi-million dollar projects such as the 139 Centre Street project under consideration.

95. Upon further information and belief, SBI also sought to cast Citadel as a "pure CM/advisor" in an attempt to falsely show that Citadel's risk, and therefore a surety's potential exposure, was limited to its purported fee and not the overall value of the contract. In general, a "construction manager-advisor" provides a fee-based service to a project owner in overseeing the work of the general contractor which has entered into a separate contract with the owner. The construction manager's fee is a small portion of the owner's overall project cost. In contrast, a "general contractor" bears responsibility for completing a construction contract for a pre-agreed lump sum price with the general contractor assuming the risk of being able to pay its subcontractors and suppliers, cover its overhead, and make a profit. Similar to the general contractor is an "at risk-construction manager", which is a contractor who has agreed with an owner to deliver the contract within a guaranteed maximum price ("GMP"), failing which the at risk-construction manager is responsible for any cost overruns. Upon information and belief, Nelson routinely sought to paint Citadel as a "pure CM-advisor" so as to mislead Hanover into believing that Citadel had little or no risk on many of its unbonded

contracts. In fact, virtually all of Citadel's contracts were "at risk" with Citadel being either a general contractor or an at risk-CM.

(e) SBI Failed to Disclose the Suspect Signatures on the Indemnity Agreement

96.    On March 6, 2008, SBI delivered to Hanover an indemnity agreement purportedly executed by Citadel (by Stack as President) and by Stack and Romero as individual indemnitors. In February, 2010, Romero advised Hanover that his signature was forged. In October, 2009, Stack advised that he did not recall signing the indemnity agreement and questioned the authenticity of his signature.

97.    The obtaining of a General Agreement of Indemnity executed by the owners of a company whereby the owners agree to personally indemnify the surety is an important part of a surety's underwriting a new potential account prior to the issuance of any bonds.

98.    The Final Questionnaire had indicated that Romero, Hassankhani and Stack would all agree to "personally indemnify Surety," and the Letter of Introduction from Nelson stated that the bonds would "be supported by the personal indemnity of the principals."

99.    By email dated December 28, 2007, Gordon had advised Nelson that Stack would not be an indemnitor.

100.    On January 25, 2008, Nelson emailed Gordon: "Dan- Is there anyway that we can get Dave Stack to sign personally?" Gordon: "Am I signing personally?" Nelson:

"You are not signing because you are not a principal". Gordon: "Does adding me as a principal help or hurt?" Nelson: "At this time we should keep you out there as advisor".

101.  Upon information and belief, Nelson never discussed directly with Stack or Romero whether they would agree to sign an indemnity agreement personally indemnifying Hanover.

102.  In February, 2008, Botticello was preparing the indemnity agreement to be executed by Citadel, Stack and Romero in favor of Hanover. She emailed Gordon: "We need to prepare the indemnity agreement. Everyone is listed as a Principal on the questionnaire. Who is the President? Secretary?" Gordon responded: "Stack is President. Please review with Jim [Nelson] since it was agreed that some would be excluded from the indemnity." Botticello responded: "I have Stack as President.. Then Ed [Romero], Mohammad [Hassankhani] and Stack personally? Is that correct?" Gordon: "No Mohammed." Botticello: "Understood…."

103.  When Botticello then called Citadel's office to obtain the middle initials for Romero and Stack, Botticello was advised that "Ed is no longer with the company". Botticello emailed Gordon: "Do we need to chat?" Minutes later, Nelson emailed Gordon: "I need you to give me a call later today or tomorrow morning so we can discuss the management team at Citadel."

104.  SBI failed to disclose to Hanover that no one at SBI ever confirmed with Stack or Romero that they had agreed to indemnify Hanover.

105.    SBI failed to disclose that it was on notice that Romero was no longer at Citadel at the time Romero purportedly signed the indemnity agreement.

106.    SBI sent to Hanover an indemnity agreement it knew was suspect, purportedly executed by Stack and Romero.

### (f) Nelson Misrepresented that Stack had a Close Relationship with the Owner of the 139 Centre Street Project

107.    In the Letter of Introduction, Nelson advised "Citadel has a close relationship with [the owner of the 139 Centre Street project], in fact, one of the owners is the Godfather to the daughter of one of the principals of Citadel."

108.    On January 10, 2008, prior to the Letter of Introduction, Gordon had emailed Nelson regarding the 139 Centre Street project: "[t]he job is a 8 floor interior renovation for my best friend (my daughter's godfather)." [Emphasis added].

109.    Despite being told by Gordon that the owner of 139 Centre Street was Gordon's daughter's godfather, Nelson misrepresented to Wright in a January 23, 2008 email: "[t]he owner is the Godfather of David Stacks daughter."

110.    This issue was material to Hanover, as Wright had emailed Nelson on February 1, 2008 asking: "[w]ho's daughter has godfather at [the owner]".

111.    In response, Nelson repeated his misrepresentation: "Dave's daughter has the Godfather at [the owner]".

112.   In fact, as Nelson know, the representative of the owner of the 139 Centre Street project was close friends with Gordon, not Stack, and was the Godfather of Gordon's daughter.

## VIII. Additional Misrepresentations in Response to Hanover's Initial Questions

113.   On February 1, 2008, after reviewing the Letter of Introduction and Final Questionnaire, Wright emailed Nelson: "finished my initial review after getting it into our system". Wright requested some additional information, including who had capitalized the company, where the money had come from since all the principals were "pretty young to cash out [from Stamack] 1.8mm" – the $1.8 million purportedly used to capitalize Citadel – and several additional questions regarding Citadel's financial statements. Wright also requested personal financial statements for all three purported principals.

114.   Wright concluded his February 1 email: "I have to say that once I got into stamack and then broke down Citadel, a surety can have a field day with the comparisons. We are basing Citadel's experience on the old Stamack and Citadel had a loss their first year and the revenue and profit does not track for the first two months of the second year, with profit fades and 43% growth. I understand that the risk is being taken out of the job in question but we can't look at the job until we get our arms around the company. Let me know your take on my analysis."

115.   Within minutes, Nelson forwarded Wright's email to Gordon and requested that he review and send his responses to Nelson. Nelson: "I need you to address the

following: Who capitalized the company? I am sure that Dave's personal statement will help us understand where the majority of capitalization came from. More importantly I need to be able to explain the profit fades on the projects listed below."

116.    On February 4, Gordon emailed Nelson with Gordon's response on the profit fade issue identified by Wright. Nelson caused Fay to revise Gordon's email so that it could be sent to Wright as if it had come from SBI, in response to some of Wright's questions.

(a) Nelson Misrepresented that Stack Capitalized Citadel

117.    In response to Wright's question as to who had capitalized Citadel, Nelson misrepresented to Wright in a February 7, 2008 email that "Dave [Stack] … put 1.8mm into company to start." Nelson knew or should have known that this information was false, as for among other reasons he had previously received Gordon's personal financial statement, which showed that it was Gordon who owned $2 million of Citadel stock.

118.    Upon information and belief, Nelson never sought to confirm this false information with Stack directly.

(b) Nelson Participated in the Fabrication of Stack's Personal Financial Statement

119.    In response to Wright's request for personal financial statements from the owners, Nelson emailed Gordon on February 4, 2008 seeking Stack's and Hassankhani's PFS. One hour later, Gordon emailed Nelson an unsigned purported Stack PFS and requested that Nelson "[p]lease review and call me to discuss."

120.   The purported Stack PFS showed net worth of $5.3 million, including $1.8 million in McCann Construction, LLC stock.  Minutes later, Gordon emailed to Nelson a revised Stack PFS, under cover of an email stating "[r]evised as requested", now bearing a purported Stack signature, showing net worth of $6.1 million, including $1.8 million in Citadel stock (revised from McCann Construction, LLC stock) and an increase of $1 million in real estate value.  Upon information and belief, the purported Stack signature is a forgery.

121.   Ten minutes after receiving the fabricated Stack PFS from Gordon, Nelson emailed it to Wright.

122.   The Stack PFS was materially false in that it showed Stack as having an ownership interest in Citadel when Stack in fact had no such ownership interest and, upon information and belief, overstated Stack's real estate interests by failing to disclose that Stack owned three of the properties jointly with his wife and did not own the fourth (purportedly located in "Dublin, Ireland") at all, thus inflating Stack's apparent net worth by at least $4 million.

123.   Nelson failed to disclose to Hanover Nelson's participation in the preparation of the fabricated Stack PFS or that Nelson had received it from Gordon.

124.   The Stack PFS made a favorable impression on Hanover's underwriters.  On February 6, 2008, Wright emailed his supervisor at Hanover, Peter Baker ("Baker"):

"PFS is strong for 42", i.e., Stack's personal financial statement was strong for someone who was only 42 years old.

125.   Nelson failed to disclose the following material facts to Wright: that there was a first version of the Stack PFS, that the Stack PFS was in fact provided by Gordon, that Nelson never contacted Stack regarding the PFS, that Nelson discussed revisions to the Stack PFS with Gordon, that Nelson knew that Stack had received only $315,000 when he was bought out of Stamack (which should have caused Nelson to question the Stack assets disclosed on the PFS forwarded by Gordon), and that Nelson had previously received Gordon's PFS showing that it was Gordon, rather than Stack, who owned the stock of Citadel.

IX. SBI's Misrepresentations Regarding Stamack Still Being in Business

126.   On January 29, 2008, Nelson and Wright had a telephone conversation in which Wright expressed Hanover's reservations about providing bonding to Citadel in light of Hanover's experience with Stamack.  The next day, Nelson emailed Wright to address these concerns and falsely represented that "Stamack is still in business and doing fine" and "stamack has not failed".  Upon information and belief, Stamack was no longer in business as McWilliams had formed JRM Construction Management, LLC in 2007.

127.   Botticello had a phone conversation with Wright on February 6, 2008, in which Wright apprised her of the concerns of Wright's superior, Baker, given Stamack's

track record.  Botticello proceeded to "talk up" Stamack, misrepresenting that Stamack

had two good existing projects at that time, one for Barclay's Bank and one for Gucci.

128.    Upon information and belief, the Barclay's Bank and Gucci projects were

not completed by Stamack, but rather by JRM Construction Management, LLC, the

company formed in 2007 by McWilliams.

X. Hanover's Reaction to the Initial Citadel Submission

129.    In February, 2008, at the time that Wright was requesting additional

information from Nelson regarding Citadel, Wright was also discussing the proposed

account with his superior, Baker.

130.    On February 6, 2008, Baker emailed Wright: "I have reviewed the

submission on this account and the Stamack (prior company) file.  We can cease the fire

drill right now.  I am not inclined to support this nor take it up the ladder to Mark

[Fitzgerald, his manager].  The basis for my decision is subjective in that I just am not

impressed with the track record that I see we had with them.*** Stamack was stated in

2003, and we declined a $35mm project back in 2005.  Stack left in 2006 to start Citadel,

so this is his second start up in 5 years. *** Is there any confirmation that the $16mm

Givaudan is truly a Cost Plus with no GMP?  We need the face page of the contract to

determine this.*** Await your details on the job and the confirmation of the Givaudan

job.  I do not see where this information is going to change my mind at this point."

XI. Nelson and SBI Acquiesced in Allowing Gordon to Impersonate Stack to Hanover

131.    A key turning point in reversing the lack of support at Hanover for SBI's Citadel submission was a telephone conference call among representatives of Citadel, SBI and Hanover that occurred on February 7, 2008 (the "Conference Call").

132.    Hanover was represented on the Conference Call by Baker and Wright, and SBI was represented by Nelson and Botticello.

133.    Unknown to Hanover at the time but known to SBI, Nelson and Botticello, was that Gordon impersonated Stack, the President of Citadel, during the Conference Call.

134.    In addition to Gordon impersonating Stack, there were two other Citadel employees who participated in the call, Eric Koester and Chris Kuntz.

135.    SBI was aware of the importance of the Conference Call to Hanover.  On February 6, 2008, the day before the Conference Call, Botticello emailed Nelson: "[t]alked to Adam [Wright]. He's sounding like Pete [Baker] doesn't want to rush in to anything where Citadel is concerned. *** He's going back to talk to Pete again. He did tell Pete that the meeting is important. Because you can tell a lot about the company and its people...."

136.    Two days prior to the Conference Call, on February 5, 2008, Nelson and Gordon exchanged emails. Nelson: "Dan-we need to have a meeting on Thursday of this

week.  Will 11am at your office work?"  Gordon: "I will check and get back to you".
Two minutes later, Gordon: "Am I attending?"  Nelson: "Who do you want to be?"

137.    On February 6, 2008, Wright emailed Baker setting forth specific items for
which Hanover would seek an explanation during the Conference Call, including taking a
closer look at the 139 Centre Street project, obtaining evidence that the $16 million
Givaudan project was at "no risk" to Citadel, the differences between Citadel and
Stamack, and the basis for Stack's PFS, which was strong for someone who was only 42
years old.

138.    On the morning of February 7, Nelson emailed Gordon: "Dan- Are we on
for 2pm?  You and I should talk again this morning before call."  Gordon: "Call me now
– we are on".

139.    Later that morning, upon information and belief, Nelson was concerned that
the issue of the "godfather" involved in the 139 Centre Street project would be discussed
with Stack during the call.  Nelson emailed Wright: "I also made a mistake about the god
father of one of the principals.  It is not Daves daughter but one of the guys who works
for citadel, PM or Super.  Not sure it make any difference but an fyi."  Of course, Nelson
knew it was Gordon's daughter who had the godfather.

140.    In the same email, Nelson also requested of Wright: "Let's not bring up
sensitive financial info in front of the group.  By sensitive Dave [Stack] does not think
some of the people need to hear that he put 1.8mm into company to start."  Upon

information and belief, Nelson was concerned that Hanover would ask Stack about the capitalization of Citadel, which Nelson knew had not been contributed or invested by Stack but rather by Gordon.

141.   Just prior to the Conference Call, Nelson emailed Gordon to ask which of the "participants" would be best suited to answer questions on financials. Gordon: "Not sure yet. I just heard that Stack is running a few minutes late from another client meeting. I may play the role of Dave Stack – at least initially – and could address it at that time." Nelson responded: "If you start the role you should just play it through. Will everyone on your end be OK with that?" Gordon: "yes and yes".

142.   During the Conference Call, while Gordon was impersonating Stack (down to Stack's Irish accent), Nelson and Gordon continued to exchange emails. After Nelson mistakenly referred to Gordon by his actual first name, "Dan", Gordon emailed: "DAVE – NOT DAN!!!!!" Nelson responded: "Sorry. That bogus accent you started with got me all flummoxed".

143.   Following the Conference Call, Botticello emailed Gordon: "in a word… 'impressive' Love the Irish brogue!" Gordon replied: "and the oscar goes to…."

144.   Nelson and Botticello acquiesced in allowing Gordon to impersonate Stack and failed to disclose the impersonation to Hanover at the time.

## XII. The Misrepresentations Made During the Conference Call

145.    During the Conference Call, Gordon (impersonating Stack) made several material representations which, in fact, were false. These representations were known or should have been known by SBI to be false. The false representations included:

• That the split-up of Stamack in 2006 was between Stack and McWilliams. In fact, as SBI and Nelson knew, the split was between Gordon and McWilliams as Stack had left Stamack at the end of 2004 and was bought out for $315,000 in March, 2005.

• That Stamack split-up because of differences between Stack and McWilliams over excessive costs and overhead being incurred by McWilliams on behalf of Stamack. In fact, as SBI and Nelson knew, Gordon controlled Stamack's finances until his incarceration, and then Gordon installed LaSaracina and Romero in his place.

• That Stack founded Citadel. In fact, as SBI and Nelson knew, Gordon had caused Citadel to be formed in 2006 and Stack did not begin working at Citadel until late 2007.

• That the liquidated damages clause had been "negotiated out" of the 139 Centre Street contract. In fact, as discussed below, SBI and Nelson knew or should have known that the liquidated damages provisions had not been removed from the contract.

• That most often Citadel was not "at risk" in its construction work, as its work was not for a "guaranteed price" but rather as construction manager with a fee and with no maximum price. In fact, as SBI and Nelson knew or should have known, virtually all

of Citadel's contracts were "at risk" with Citadel being either a general contractor for a fixed price or a construction manager for a guaranteed maximum price.

• That Citadel's backlog (unperformed, contracted-for work), exclusive of "construction manager with no maximum price" contracts, was less than $25 million including the 139 Centre Street project under consideration. In fact, as noted in paragraph 59 above and as discussed below, Gordon had initially advised Nelson that the backlog was $100 million.

• That Citadel's new $16 million Givaudan contract was "no risk" since Citadel was a construction manager with no guaranteed maximum price. In fact, as discussed below, as SBI and Nelson knew or should have known, Citadel was an at risk general contractor on the Givaudan contract.

(a) SBI and Nelson Failed to Disclose Citadel's True Backlog to Hanover

146.    Gordon had at least twice advised Nelson that Citadel's current backlog of uncompleted work was far in excess of the $25 million represented to Hanover during the Conference Call.

147.    On December 8, 2007, Gordon emailed Nelson that the "[c]urrent backlog is over $100 million".

148.    In the first version of the Contractor's Questionnaire completed by Gordon, the backlog was represented as $55 million.

149.   The size of Citadel's backlog of unperformed work was an important issue to Hanover's underwriters both before and after the Conference Call. Hanover was concerned that Citadel, as a relatively new company, not be overextended.

150.   Nelson was aware that "a backlog that is 'swollen' will require more credit support even if most jobs are not bonded," as he stated in a January 10, 2008 email to Gordon. Nelson's email also stated: "I am hoping that actual signed contracts that will appear on a current work in process report do not total more than 30mm including this job."

151.   On January 14, 2008, Gordon emailed Nelson a current (as of December 31, 2007) Citadel balance sheet, an income statement and a work in progress report ("WIP"), stating: "I worked on this from my 'sick bed'." Gordon's email thus conveyed to Nelson that Gordon was personally authoring Citadel's financial schedules.

152.   Citadel's WIP report purported to identify Citadel's uncompleted contracts. For each contract, the WIP report identified, among other things, the original contract amount, the costs incurred to date, the costs to complete the work, the percent of contract completion and the projected profit, all as of the operative date of the particular WIP report.

153.   The December 31, 2007 WIP report created and emailed by Gordon on January 14, 2008 showed a $17.7 million backlog. If the 139 Centre Street project was added, the backlog would have been in excess of $36 million. Nevertheless, Nelson

emailed Wright on January 23, 2008: "Total backlog would be 23mm", never disclosing to Wright that the Citadel backlog was initially represented by Gordon as $100 million and then later as $55 million.

154.    The Final Questionnaire, prepared with Nelson's assistance, and provided by Nelson to Wright on January 29, 2008, showed the "largest uncompleted backlog" as "$18+ million" and the "largest backlog expected next year" as $25 million.

(b) The Givaudan Misrepresentation

155.    Upon information and belief, SBI and Nelson knew or should have known that during the Conference Call that the Givaudan contract was an "at risk" contract, i.e., that Citadel was a general contractor for a lump sum price and that therefore Citadel assumed the risk for any cost overruns.

156.    The Givaudan contract was the largest unperformed contract on Citadel's WIP report. Upon information and belief, in an effort to reduce Citadel's backlog for underwriting purposes, Nelson emailed Gordon on January 28, 2008: "would be helpful if it were a pure CM and reflected on the WIP as such … if this is a pure CM job then we don't need to carry the job as part of the backlog … Any idea's? [sic]" Gordon asked Nelson to call him.

157.    Later that day, Gordon emailed Nelson: "Leave Givaudan on WIP or not????" Nelson: "put asterisk next to job and explain below that it is pure CM [Construction Manager] project." Gordon followed Nelson's instruction by placing an

asterisk next to the line "GIVAUDAN FRAGRANCES" on the WIP report, with the notation: "denotes Citadel is acting in Construction Manager 'as agent' Capacity", and emailed it to Nelson "As requested." On January 29, 2008, Nelson emailed Wright the footnoted WIP in an effort to mislead him into believing that Citadel had no risk on the Givaudan contract.

158.   Hanover had identified the need to confirm that the Givaudan contract was at "no risk" to Citadel as a material issue for Hanover. On February 6, 2008, prior to the Conference Call, Baker had emailed Wright to obtain "the face page of the contract to determine this."

159.   Following the Conference Call, Wright contacted Nelson on February 8, 2008 (a Friday) requesting the first page of the Givaudan contract to confirm that it was indeed as construction manager with no risk to Citadel. Gordon emailed Nelson: "I'm out of the office. We can get it for them on Sunday or Monday."

160.   Upon information and belief, the requested "as construction manager" contract did not exist due to the fact that Citadel was actually an "at risk" general contractor on the Givaudan project.

161.   Upon information and belief, on February 11, 2008 (a Monday), Gordon caused a fictitious first page of a "construction manager" contract to be created and emailed to Nelson. Nelson then emailed the fictitious first page to Wright, stating: "This is the first page of the Givauden Fragrance Contract that Pete [Baker] requested". Nelson

also falsely stated to Wright: "I tried to send this to you Friday but it was 'returned'".

Nelson did not disclose to Hanover that the page only had been emailed to Nelson by

Gordon's assistant on that Monday.

(c) The Misrepresentation of No Liquidated Damages

162.   Upon information and belief, Gordon (impersonating Stack) stated during

the Conference Call that liquidated damages had been negotiated out of the contract for

the 139 Centre Street project for which bonding was being sought from Hanover.

163.   On January 25, 2008, Gordon had emailed Nelson a draft version of the 139

Centre Street contract (dated November 28, 2007). Later that day, Nelson emailed

Gordon: "I noticed in the Contract the 'steep' Liquidated damages of $25,000 per day."

Within minutes, Gordon responded: "Liquidated Damages have been negotiated out. The

document I sent you was their first draft. We are still 'finalizing' the terms."

164.   Immediately following the Conference Call, Nelson emailed Gordon

requesting "a note explaining that the 25m per day liquidated damages clause has been

negotiated out of the contract." Gordon responded: "The liquidated damages clause has

been negotiated out of the contract" signing it "Dan/Dave". Upon information and belief,

Nelson relayed this false information to Wright by telephone.

165.   In fact, liquidated damages were not negotiated out of the 139 Centre Street

contract, which contained liquidated damages of $15,750 for each day of delay.

166. Nelson knew or should have known that the liquidated damages provision was not removed from the 139 Centre Street contract and failed to disclose to Hanover that his only source for this false information was Gordon.

XIII. Misrepresentations Regarding Citadel's Financials

167. Hanover relied, in part, on information supplied by Nelson and contained in Citadel's in-house financial schedules in reaching its decision to issue bonds for Citadel.

168. Known to Nelson, but not known to Hanover, was that drafts of the in-house schedules had been authored by Gordon and provided to Nelson for his review and comment. Thereafter, Nelson requested certain revisions, which were incorporated by Gordon into revised schedules, prior to Nelson transmitting the schedules to Hanover.

169. Some of Citadel's in-house financial schedules were also incorporated into "audited" financial statements prepared by LaSaracina. LaSaracina was a personal friend of both Gordon and Nelson. Nelson knew that LaSaracina was Gordon's longtime personal CPA.

170. Shortly before Gordon's imprisonment in December, 2005, Gordon had installed LaSaracina as Stamack's CFO and appointed him to its Board of Directors. LaSaracina functioned as Gordon's personal representative at Stamack until October 20, 2006, when LaSaracina was dismissed by Stamack and replaced by Romero as Gordon's representative on Stamack's Board of Directors.

171.   On October 27, 2006, LaSaracina emailed Nelson: "I am not at stamack any longer. Will call and explain". Nelson also spoke to Romero by phone that same day, which he referred to in an email to LaSaracina that evening: "Sounds like a lot of changes. I spoke to Ed. I don't think I can move forward until I speak with you and get a clear understanding of what is happening- ownership, capitalization etc... Call me asap to discuss details. Let me know when we can talk."

172.   Nelson was also in contact with EES's new owner in 2006 regarding LaSaracina. Upon information and belief, she informed Nelson that she had replaced LaSaracina as EES's accountant because (a) its bank complained that LaSaracina was too close to Gordon, and (b) she believed that LaSaracina had incorrectly reported EES's equity as $371,000 for a prior year when it was actually only $40,000.

173.   Despite the foregoing, Nelson emailed Gordon on January 3, 2008: "In order to formalize a bond program or even provide a single bond I need the 10/31/07 CPA statement. If Eisner can't deliver, can Bob LaSaracina get one done immediately?" Gordon responded: "I'll speak to Bob and find out if it is possible – would only be a "review' and not an audit. Is that ok?" Thereafter, Citadel retained LaSaracina to prepare an audited financial statement.

174.   Prior to LaSaracina's engagement by Citadel, Citadel's in-house financials for the fiscal year ending October 31, 2007, as prepared by Gordon, were provided to Nelson on December 14, 2007.  The financials showed a loss of $540,129.

175.   Following LaSaracina's engagement, Nelson emailed Gordon on January

11, 2008: "progress on the large bond [139 Centre Street] will begin to gain momentum

when I receive the 12/31/07 in house which I'm sure looks strong as well as the 10/31/07

Audit from Bob which will probably look better than the in house as long as Bob works

his magic". [Emphasis added].

176.   Gordon and Nelson exchanged further emails on January 24, 2008. Nelson:

"Bob indicated that the Audit will look better than the internal #'s." Gordon: "Maybe

Bob is smoking something different than cigarettes?" Nelson: "Bob L. needs to get his

magic wand out in order to make the Audit look strong." Gordon: "I'll do my best. Let's

talk ASAP and maybe conference in Bob." Two days later, Nelson and Gordon received

from LaSaracina a "draft" audited statement reducing the fiscal year end loss from

$540,129 to $299,525.

177.   In a January 28, 2008 email to LaSaracina and Gordon, Nelson requested a

change to LaSaracina's draft: "When you finalize the statement this morning could you

classify 'due from officer' as a current asset. This will further help the case I am trying to

make with the bond company. I look forward to the final statement." Nelson's request to

re-classify the $128,261 "due from officer" was incorporated in LaSaracina's "Final

Audit Report" received by Nelson on January 29, 2008.

178.   The Final Audit Report showed a $273,712 loss for the year ending

October 31, 2007 (as compared to Gordon's original in-house report showing $540,129).

Nelson provided the Final Audit Report to Wright on January 29, 2008, without

informing Wright of (a) the relationship between LaSaracina and Gordon; (b) Nelson's knowledge of alleged faulty reporting by LaSaracina on a prior account, (c) the prior "drafts" which showed a Citadel loss almost twice as high as ultimately reported, and (d) Nelson's participation in revising Citadel's financial statement.

179.   Upon information and belief, Nelson knew that the Final Audit Report provided to Hanover, as well as later Citadel financial statements prepared by LaSaracina and provided by Nelson to Hanover, contained materially false information.

180.   As for LaSaracina, he was subsequently sentenced by Judge Christopher F. Droney in Hartford to 63 months of imprisonment, followed by three years of supervised release, for defrauding clients of approximately $4.1 million and for failing to pay more than $700,000 in federal employment taxes.

XIV. Hanover Agrees to Issue the 139 Centre Street Bonds

181.   Ultimately, Hanover agreed to bond Citadel and, on March 25, 2008, issued performance and payment bonds on behalf of Citadel for the 139 Centre Street project in the penal sum of $22,950,467.

182.   The bonds were signed by Wright on behalf of Hanover and forwarded to SBI. Thereafter, SBI forwarded the bonds to Citadel. The final bonds were signed on behalf of Citadel by Dan Gordon, as "Secretary". SBI did not provide to Hanover copies of the bonds as signed by Gordon.

183.   As discussed below, ultimately, Hanover incurred a loss of $599,332 on these bonds after Citadel defaulted under the contract.

## XV. SBI's Lucrative Fee Arrangement Provided Motivation Not to Disclose Gordon

184.   Unknown to Hanover, SBI and Citadel had entered into a "fee" arrangement whereby SBI charged Citadel a flat 1.5% fee based on the penal sum of the bonds issued by Hanover.

185.   For example, SBI collected a fee of $344,257 for the 139 Centre Street bonds based on the bonds' penal sum of $22,950,467.

186.   From its 1.5% fee, SBI paid to Hanover the applicable premium based on Hanover's filed rate schedules, net of the agreed commission that Hanover owed to SBI, as agent.

187.   The fee arrangement was very lucrative to SBI.  For example, on the 139 Centre Street project, SBI's fee retained from Citadel was $187,636, more than the premium paid to Hanover, which assumed all of the risk.

188.   For the bonds issued by Hanover, SBI billed Citadel total fees of $669,963. Nelson himself received $60,195 of the fees paid by Citadel.  Upon information and belief, this was the equivalent of a sales commission and was separate and apart from Nelson's base compensation, bonus, partnership shares or other compensation.

XVI. <u>Continued Misrepresentations Regarding Citadel's Financials</u>

189.   Nelson's participation in the preparation of Citadel's false financial statements continued after the issuance of the 139 Centre Street bonds.

190.   One of those later financial statements was an in-house preliminary WIP, as of April 30, 2008 (the mid-point of Citadel's fiscal year). The WIP detailed the status of Citadel's uncompleted contracts, including the original contract amount, the costs incurred to date and the cost to complete the work. On May 14, 2008, Gordon emailed the preliminary WIP to Nelson. Gordon had authored the WIP, which showed total cost to complete current contracts of $31,106,142, an amount greater than projected in the Final Questionnaire provided to Hanover and greater than that which Nelson understood would be acceptable to Hanover's underwriters.

191.   The next day, Nelson emailed to Wright a revised version of the WIP report, which now included a footnote indicating that the "Givaudan Fragrances" and "Flack & Kurtz" projects were "where Citadel Construction Corp is acting as a Construction Manager for a 'fee'". The text of Nelson's email misrepresented that "Backlog, net of Cost plus CM jobs, is approx.. 22.7 mm."

192.   Upon information and belief, the Givaudan and Flack & Kurtz projects were undertaken by Citadel as a general contractor for a fixed sum. Accordingly, Citadel was "at risk" if these contracts could not be completed for their lump sum price. Citadel's cost to complete these "at risk" contracts was at least $31,106,142, as originally

disclosed by Gordon to Nelson.   By misrepresenting the size of Citadel's "backlog", Nelson led Hanover to believe that issuing bonds for Citadel was less risky than it actually was.

193.   On June 9, 2008, Gordon forwarded to Nelson an April 30, 2008 draft financial statement prepared by LaSaracina, which, among other things, contained a WIP indicating that the "Estimated Costs to Complete" Citadel's contracts in progress was $31,966,142 – and did not indicate that any of them were "cost plus CM jobs"(i.e., no risk contracts).

194.   Nelson did not forward the financial statement as prepared by LaSaracina to Wright. Instead, Nelson emailed Gordon: "Please have Bob footnote the 2 projects on the WIP that are 'cost plus'".

195.   Upon information and belief, none of Citadel's contracts included on the financial statement were "cost plus" contracts. However, when LaSaracina supplied the final mid-year financial statement on June 12, 2008, he footnoted the Givaudan and Flack & Kurtz projects with the false notation "Cost plus fee contract". Nelson provided this financial statement to Wright, which showed that the total cost to complete Citadel's "at risk" contracts was only $22,515,396, when it was in fact at least $31,966,142 – the amount shown on the draft financial statement prepared by LaSaracina, which Nelson requested be revised.

196.    On June 25, 2008, SBI issued the LaGuardia College Bonds (No. BCE 1833922) in Hanover's name without informing Hanover of the true facts known regarding Citadel's financial status as of that date.

197.    If Hanover had known the true facts regarding Citadel's financial status, including that its "at risk" cost to complete was in excess of $31 million (including the LaGuardia College contract), Citadel would have been disqualified from receiving additional bonds from Hanover, including the bonds issued by Hanover for Citadel in connection with the LaGuardia College project.

198.    Hanover incurred a loss of $209,917 on the LaGuardia College bonds after Citadel defaulted under the contract.

199.    Six months later, the pattern repeated.  On January 13, 2009, Gordon emailed an October 31, 2008 draft WIP report to Nelson: "that will be in the Audit Report which we are expecting in the next week or so."  The report, among other things, showed that the "Costs to Complete" Citadel's current contracts was $25,207,786 – and did not indicate that any of them were "cost plus" contracts.

200.    Nelson did not forward the WIP to Wright.  Instead, Nelson emailed Gordon: "Would you have it noted at the bottom of the WIP that both the Hotel Bel Air and Givauden are 'Cost Plus Fee' pure CM projects."

201.    Upon information and belief, none of the projects on the report were contracted for on a "cost plus" basis.  As Nelson had requested, Gordon supplied a

revised WIP report later that day on which he footnoted the Givaudan and Hotel Bel Air projects with the false notation, "Cost plus fee contract". Nelson emailed this report to Wright on January 13, 2009: "The cost to complete at 10/31 (net of cost plus work) was 16mm at year end". Nelson's email caused Wright to believe that the total cost to complete on Citadel's "at risk" contracts was only $16 million, when it was, in fact, at least $25,207,786 – the amount shown in the report before Nelson requested that it be revised – an amount that would have disqualified Citadel from receiving additional bonds from Hanover, including the Downing Bonds (discussed below).

## XVII. SBI's Failure to Obtain Hanover Approval for the Rider to the 1515 Bond

202.   Hanover incurred a $900,000 loss when it settled a claim made under a performance bond (the "1515 Bond") issued to 1515 Broadway Fee Owner, LLC c/o SL Green Realty Corp. ("SL Green").

203.   On September 24, 2008, Gordon emailed Nelson: "I need a bond ASAP for about $5 million for an interior job." Nelson responded: "Should not be a problem. Please have Kim or someone else email me a completed 'bond request' form. Also, please send me a current WIP (July or August). I am thinking that estimated cost to complete for [sic] 'at risk' projects is under 20mm."

204.   The next day, September 25, 2008, Gordon emailed Nelson a handwritten, completed SBI bond request form seeking performance and payment bonds in favor of SL Green, as obligee, in the amount of $4,904,100 for a project described only as "11th & 12th Floors 1515 Broadway". The form itself sought certain information, including the

contract and bond amounts, whether there would be retainage, the contract date, whether the bond was a "special form", whether there would be liquidated damages, the completion date, and the bid results (i.e., the identity of the second and third low bidder). Of this information, the form as prepared by Gordon provided the contract and bond amount amounts, and stated that the retainage was 10% and there were no liquidated damages; the other items were left blank.

205.   Five days later, on September 30, 2008, Nelson emailed Wright a revised SBI bond request form.  The form now contained several additional pieces of information which, upon information and belief, were handwritten in by Nelson himself.  Nelson's revisions were as follows: he added "office fit up & interior renovation" to the project description, "TBD" to the contract date, "No" to whether the bond was a special form, and "N/A – negotiated" to the bid results.  Nelson's covering email to Wright stated: "Adam – Attached please find a final bond request for Citadel.  The project is interior fit up/renovation at 1515 Broadway.  The job includes fit up of 2 floors in the building.  The owner is SL Green Realty Corp.  SL Green is a publicly traded company on the NYSE. They own over 23mm square ft of office space in NYC making them NYC largest commercial office landlord."

206.   Upon information and belief, various of the foregoing representations made by SBI and Nelson were either created by Nelson in order to gain underwriting approval from Hanover and/or based solely on information provided to Nelson by Gordon, without

obtaining or reviewing the underlying contract or speaking to anyone at SL Green or Citadel (other than Gordon).

207.   Based upon the representations made by Nelson, Wright gave verbal underwriting approval for the 1515 Bond to SBI on September 30, 2008, and thereafter Wright provided his written approval by email to Fay of SBI dated October 2, 2008.

208.   Fay signed (but did not date) the 1515 Bond and payment bond and delivered the original bonds to Citadel on or about October 1, 2008.  In her cover memo to Citadel, Fay requested that Citadel "please send us a copy of the dated bonds for our files."  Upon information and belief, SBI never received copies of the dated and executed bonds.

209.   While it was represented to Hanover that the 1515 Bond was securing Citadel's performance of a straightforward "office fit up & interior renovation" project for SL Green, a large, publicly traded real estate company, upon information and belief, Gordon had actually procured the bond to guaranty a wholly separate and very different transaction.

210.   On September 30, 2008, a Gordon owned entity, WURK-Times Square, LLC ("Wurk"), which had no corporate affiliation with Citadel  had entered into a ten year lease with SL Green for the 11th and 12th floors at 1515 Broadway.  As part of that lease, SL Green agreed to pay Wurk $4,485,634 towards the build-out of the space.  As part of the lease, SL Green required Citadel to execute a guaranty that, if Wurk defaulted

on its lease, Citadel would reconfigure the two floors at no cost to SL Green so that those floors could be rented to another tenant. As additional security of Citadel's obligations under the guaranty – i.e., to gratuitously perform up to $4,904,100 of work -- SL Green also required a surety bond.

211.   Earlier in September, Gordon had actually contacted Nelson about the potential need for a lease bond. A lease bond is a contract between three parties (landlord, tenant and surety) and is held by the landlord in lieu of a cash security deposit, letter of credit, or a personal or corporate guaranty, and serves as security for the tenant's full and complete performance of the terms of its commercial lease.

212.   On September 11, 2008, Gordon and Nelson exchanged emails. Gordon: "I'm working on a deal where we may require a lease bond ($1.5mm). The landlord and lawyers are unfamiliar with the product. Could you explain it to Adam Rappaport of Cushman/Wakefield – our broker for the deal?" Nelson responded: "I am happy to speak with Adam. Prior to placing a call to him I would like a brief overview of the deal. Is this for Citadel? What is the term of the lease? does 1.5mm represent the annual obligation? Who is the landlord?" The next day, Nelson emailed Gordon: "I spoke to Adam yesterday and explained how a 'lease bond' functions. Effectively it is a financial guarantee but without the immediate liquidity that [sic] an ILOC from a bank." Upon information and belief, Adam Rappaport was the broker representing Gordon and his entity Wurk in negotiations with SL Green related to the space at 1515 Broadway.

213.   While none of the foregoing information was known to Hanover at the time it issued the 1515 Bond, based on the revisions made by Nelson to the bond request form, he either knew or should have known the true nature of the transaction underlying the 1515 Bond and, in any event, should have informed Hanover of the revisions made to the bond request form. Had these facts been known to Hanover, it would never have agreed to issue the 1515 Bond for, among other reasons, it would have been an impermissible financial guarantee bond, on which Hanover's potential exposure would not be known for up to ten years.

214.   Following receipt of the 1515 Bond, Gordon negotiated additional changes in the Wurk lease deal with SL Green, which required a small $9,000 change in the penal amount of the 1515 Bond. In addition to changing the amount of the 1515 Bond, SL Green also requested that Gordon obtain Hanover's written assurance that it understood that the bond was securing Citadel's potential obligation to perform $4.9 million of reconfiguration work for free.

215.   Fay provided to SL Green a "standard" form bond rider on December 17, 2008, which was rejected by SL Green because it only made the $9,000 change in the amount of the bond without addressing the additional language requested by SL Green to clarify Hanover's understanding that it was bonding a Citadel obligation to perform work for which SL Green had no duty to pay.

216.   Nelson engaged in multiple communications with Gordon regarding the specific language requested by SL Green to be included in the bond rider. In a December

17, 2008 email, Nelson informed Gordon that the SL Green proposed language was "impossible" because it "removes the surety rights under default". Nelson advised that he "can't add the language". Nelson suggested alternate language.

217.   At no time did Nelson, Fay or anyone else at SBI inform Hanover of SL Green's request for the specific language or the discussions with Gordon that followed. At all times, Nelson and SBI continued to conceal Gordon's involvement from Hanover.

218.   Later on December 17, 2008, Gordon and SL Green negotiated a revised rider that still included the language that Nelson had earlier found "impossible".

219.   Without seeking or obtaining underwriting approval from Hanover, Fay executed the revised rider on December 18, 2008 and sent it by overnight delivery to Citadel, for ultimate delivery to SL Green, who received and accepted it on or about December 22, 2008.

220.   Fay did not forward the executed rider to Wright until 2:11 p.m. on December 24, 2008, Christmas Eve.  Fay's email merely stated "for your files".

221.   In August, 2009, SL Green notified Hanover of a potential claim under the 1515 Bond. On October 15, 2009, Hanover sought to discuss the 1515 Bond and rider with Nelson.  Nelson immediately emailed Gordon: "I hope Wurk/SL Green is settled immediately." Gordon responded: "Why?"  Nelson replied: "Because it would be one less thing for them [Hanover] to stress about.  While neither the underwriter or I requested the contract it appears that the contract contains a rider that adds obligations

that neither I or Hanover would/could have agreed to." Of course, that is exactly what SBI did when it approved the rider without obtaining Hanover's approval.

## XVIII. Nelson Redacted Gordon's Name from the Downing Street Contract

222.   Hanover incurred its largest loss on the Citadel account on the performance and payment bonds issued in January, 2009 to Downing Street Developers LLC (the "Downing Bonds"). The Downing Bonds were in the penal sum of $5 million and were issued in connection with Citadel's contract to build three luxury townhouses in Manhattan.

223.   Nelson altered the copy of the underlying contract between Citadel and Downing Street that was sent to Hanover, again concealing Gordon's involvement with Citadel from Hanover.

224.   Prior to the issuance of the Downing Bonds, Hanover had requested from Nelson a copy of the underlying contract between Downing Street and Citadel. Nelson requested that Gordon provide a copy of the contract.

225.   Gordon provided a draft contract to Nelson on January 11, 2009. The draft contract listed Gordon as "Principal" and Stack as "Project Executive" (¶2.2, page 2), and provided for Gordon to sign the $8.5 million contract as "secretary" of Citadel (page 6).

226.   Prior to emailing the draft contract to Wright on January 13, Nelson removed or "redacted" both Gordon's name as "Principal" (¶2.2, page 2) and Gordon's name under the Citadel signature block (page 6).

227.   The final executed version of the contract did not contain the Nelson redactions, and was, in fact, executed by Gordon as secretary of Citadel and listed Gordon as "Principal" and Stack as "Project Executive".

228.   Upon information and belief, Nelson never sought to confirm that his redactions were made in the final executed contract.  At no time did Nelson or SBI provide a copy of the final contract to Hanover.

229.   Downing Street Developers defaulted Citadel under the contract effective November 4, 2009, and made demand on Hanover to satisfy its obligations under the Downing Bonds.  In discharging its obligations, Hanover incurred losses and expenses of $4,928,630.

XIX. Nelson Misrepresented the Status of the 139 Centre Street Project

230.   In addition to concealing Gordon's involvement from Hanover, Nelson induced Hanover to issue the Downing Bonds by misrepresenting the status of the 139 Centre Street project.

231.   The 139 Centre Street project had a contractually mandated January 16, 2009 completion date.  Hanover was unwilling to provide the requested Downing Street bonds unless the 139 Centre Street project was substantially complete.

232.   In a January 13, 2009 email to Wright, Nelson represented that "[t]he 22mm Centre street job is substantially complete".  Then, in a January 14, 2009 phone

call, Nelson advised Wright that Nelson had seen the 139 Centre Street building that day and it was "basically complete".

233.   In reliance upon Nelson's representations regarding the 139 Centre Street project, Hanover issued the Downing Bonds on January 16, 2009.

234.   Upon information and belief, the 139 Centre Street project was not substantially complete as of January 14, 2009, a fact which was known or should have been known by Nelson.

## XX.  At All Relevant Times, SBI and Nelson Knew that Gordon was "Radioactive" to Hanover and that Gordon Owned Citadel

235.   At all relevant times, SBI and Nelson knew that Hanover and certain other sureties would not issue bonds to any company with which Gordon was involved.

236.   SBI and Nelson's initial knowledge that Gordon was not acceptable to these sureties was confirmed by their actions in concealing Gordon from Hanover when procuring the lien discharge bond in September, 2005 for Stamack, as described above.

237.   While Nelson continued to conceal Gordon's involvement with Stamack from Hanover, Nelson did disclose Gordon's involvement to another surety.  On February 27, 2008, at the very time that Nelson was seeking a bonding program from Hanover for Citadel, Gordon emailed Nelson: "Citadel, at present, does union and non-union work.  We need to have the ability to have union laborers on some of our union jobs….As such, we have come up with Pequot Construction, LLC ("Pequot"), a new company that is not owned by Citadel (instead, owned by me).  The union requires a

$50,000 surety bond for dues payments, etc. Can you help?" Nelson approached at least two surety companies, Hanover and CNA, without disclosing that Gordon was the owner of Pequot, since underwriters at those companies were aware of Gordon's criminal background.

238. Ultimately, Nelson secured the bond from Capitol Indemnity. Upon information and belief, Capitol Indemnity did not know of Gordon's crimes and therefore Nelson disclosed to Capitol Indemnity Gordon's ownership of Pequot and SBI delivered a general indemnity agreement executed by Gordon, both individually and in his capacity as "managing member" of Pequot.

239. SBI and Nelson's knowledge that Gordon was not acceptable to Hanover (and certain other sureties) was again confirmed in an email exchange between Nelson and Gordon on December 3, 2008. Gordon: "I am thinking of 'taking over' a NYC electrical contractor…would it be 'bondable' with me as its 'principal owner'". Nelson: "Is there an option to 'your' ownership, no offense intended." Gordon: "Not sure about the 'option' – would have to think about it." Nelson: "Ok. Please think about options and then let's discuss." Gordon: "Can you 'feel out' one of the sureties to 'test' if I am still 'radioactive'?" Nelson: "we'll find support."

240. Nelson continued to conceal Gordon's involvement with Citadel from Hanover throughout 2009.   For example, in June 2009, Citadel settled a payment bond claim that had been made by a subcontractor to Citadel on the 139 Centre Street project. On June 26, 2009, Gordon emailed the settlement agreement to Nelson.  Nelson

forwarded the Gordon email to Botticello: "Bette – Can you forward this back to me without Dans [sic] name on it so I can send to Hanover". Botticello forwarded it to Nelson minutes later, as if she had originated it rather than Gordon.

241.   In addition, during mid-2009, after Hanover refused to issue a bond for Citadel, Nelson began looking for another surety willing to provide bonds to Citadel. In July 2009, SBI sought to arrange a meeting with Chubb Insurance Company. On July 24, 2009, Nelson and Gordon exchanged emails. Nelson: "Below please find a note from Chubb. They would like to meet in the next few weeks... Finally, we need to discuss your involvement as you are probably one of the most impressive individuals associated with Citadel." Gordon: "I thought I am radioactive." Nelson: "You are. However, you are also extremely helpful in addressing underwriters concerns. My preference is to have you involved, just need to figure out how."

242.   As for SBI and Nelson's knowledge that Gordon owned Citadel, written communications among SBI's employees concerning Citadel's commercial insurance needs further demonstrate that SBI understood Gordon to be both the owner and an officer of Citadel.

243.   Upon information and belief, in 2008, Citadel had paid premiums of $1.4 million for its commercial insurance policies from which its then broker received commissions.

244.   When Citadel's insurance policies came up for renewal in 2009, SBI actively pursued the business.

245.   In early 2009, Nelson introduced Citadel to the team that SBI had formed to package an insurance proposal for Citadel.  On January 17, 2009, Nelson emailed Janice Tirrell ("Tirrell"), Tom Formica ("Formica") and Laurie Winter of SBI's commercial property and casualty department: "Citadel has been around for almost 2 years. <u>Dan has owned at least 2 other construction firms,</u> a legal firm and been president of allegheny [sic] Energy as well as very high up in Merrill Lynch. Probably one of the most intelligent people I have ever met. Still in his 30's. He may have been a little 'to smart' [sic] 4 or 5 years ago. * * * <u>Dan is the business person</u> while Dave Stack and the management team run the day to day operattions [sic]." [Emphasis added].

246.   Tirrell responded by email: "So we do not get into a misrepresentation problem with our carriers, can you tell me what/who is the ownership of Citadel?  Is it 100% Dan. Is it by the management team? *** Knowing the legal ownership of Citadel will help me not to get into a concealment/misrepresentation situation."

247.   Upon information and belief, Nelson confirmed to SBI personnel that Gordon was an owner, as evidenced by March 5 and 6, 2009 emails from Cynthia DeStefano, a personal lines agent at SBI, to Gordon, copied to Nelson and Formica, enclosing personal insurance proposals and applications, which identified Gordon as "Business Owner" of "Citadel Construction".

248.   In addition, when SBI was successful in selling a commercial lines insurance package to Citadel, Gordon signed several documents on behalf of Citadel on March 2, 2009, each time identifying himself as "CFO" or "VP" of Citadel.

249.   SBI began selling commercial insurance to Citadel as of March 1, 2009 and collected approximately $100,000 in commissions.

250.   An exchange of emails between Gordon and Nelson on March 12 and 13, 2009 further demonstrates Nelson's knowledge that Gordon owned Citadel and Nelson's willingness to obtain bonds for projects controlled by Gordon. Gordon emailed Formica on March 12, 2009, with a "cc" to Nelson: "I am in the process of buying a property in Palm Beach, Florida. The property consists of a 'shell' of a building that will be built into a 79 room boutique hotel. I need to get a quote for property and liability coverage. Can you help?" Nelson responded with an email directly to Gordon: "Dan- Is this the same job which you mentioned may require a bond?" Gordon: "Yes but I haven't decided if I want a bond." Nelson: "Of course you do. With a 'friendly' owner [i.e., Gordon] we can get a nice discount." Gordon: "Is that true (ie. A discount)? What would a $25 million bond cost for such a 'friendly' owner. Also, I don't want to 'sap' Citadel's bonding capacity." Nelson: "Rather than the typical 1.5% I believe that we can get the premium down beneath 1%. We would obviously still need to underwrite (confirmation of financing, review contract etc..). Would it be a construction manager 'at risk' or pure GC. Either way I believe I can get it under 1%. Does this help. Not sure who will finance construction loan but having a 'bonded' GC may help the process." Gordon: "I don't

think the lender is worried about *the bonded GC since I am one in the same.* Let me know how 'cheap' the boned is and I'll think about it. I want to make sure though that if I get a bond it won't hurt Citadel's bonding line for other jobs." [Emphasis added]. Nelson: "Thanks for thinking about it. I'll touch base with you next week regarding the pricing." When Gordon emailed Nelson on March 26, 2009 that the "Florida bond would be for $26,868,370. Contract between Citadel and Palm House Owner, LLC would be CM 'at risk'". Nelson responded with a quote for bonding that contract: "Price would be $257,936 (.96%)."

251.    Gordon's check signing and bill approval authority and possession of a company credit card were other indicia of Gordon's control over Citadel. Gordon had obtained check signing authority for Citadel's accounts at Signature Bank soon after his release from Leavenworth Penitentiary, as well as a Citadel American Express card.

252.    SBI and Nelson knew that Gordon had the authority to approve bills and sign checks. For example, on January 9, 2009, referring to the 1.5% fee to be paid by Citadel to SBI for the 1515 Bond, Gordon emailed Nelson: "I approved the invoice for payment. Expect a check next week." Nelson scheduled a meeting with Gordon at Citadel's offices for January 14, 2009. At that meeting, Nelson was handed Citadel's check No. 5698 payable to SBI in the amount of $73,427 bearing Gordon's signature, in payment of SBI's fee for the 1515 Bond.

253.    Upon information and belief, during the period of time from when Gordon first approached Nelson about assisting in obtaining bonds for Citadel in December, 2007

up to the issuance of Hanover's last payment and performance bonds for Citadel on July 8, 2009, Nelson never once contacted, emailed or met with Stack. Nevertheless, Nelson routinely advised Hanover that the information that Nelson was providing regarding Citadel came from Stack.

XXI. Hanover Incurred Losses and Expenses

254.   In August, 2009, Stack notified Hanover of potential cash flow difficulties at Citadel. Soon thereafter, Citadel ceased operations due its lack of cash. Upon investigation, Hanover learned that Gordon had been using Citadel's funds to pay for his personal obligations and those of his related other companies.

255.   Ultimately, Citadel was defaulted on eight contracts for which Hanover issued surety bonds. To date, Hanover has incurred the following losses under the bonds issued in connection with those contracts:

(a)   In connection with the 139 Centre Street bonds (No. BCE 1833891), Hanover has incurred losses of $599,332.

(b)   In connection with the 1515 Bond (No. BCE 1855367), Hanover has incurred losses of $905,000.

(c)   In connection with the Downing Street bonds (No. BCE 1877613), Hanover has incurred losses of $3,833,986.

(d)   In connection with the Jacobi Hospital - Data Center bonds (No. BCE 1877600), Hanover has incurred losses of $400,438.

(e)     In connection with the Jacobi Hospital – DP2 bonds (No. BCE 1906752), Hanover has incurred losses of $599,344.

(f)     In connection with the Culinary Arts Institute bonds (No. BCE 1906818), Hanover has incurred losses of $170,455.

(g)     In connection with the Jacobi Hospital – DP3 bonds (No. BCE 1906837), Hanover has incurred losses of $2,508.

(h)     In connection with the LaGuardia Community College bonds (No. BCE 1833922), Hanover has incurred losses of $209,917.

256.    In addition to the foregoing losses, Hanover has incurred substantial expenses, including legal and consulting fees, in administering its obligations under the bonds issued on behalf of Citadel.  To date, these expenses exceed $2 million.

257.    Hanover continues to have additional potential exposure under the bonds issued on behalf Citadel, and continues to incur expenses in connection with the bonds, including legal and consulting fees.

AS AND FOR A FIRST CLAIM FOR RELIEF
(Breach of Contract – Agency Agreement)

258.    Hanover repeats and realleges each and every allegation contained in paragraphs 1 through 257 above.

259.    Hanover has performed its obligations under the Agency Agreement.

260.   SBI and Nelson's acts and omissions constitute breaches of the Agency Agreement, including but not limited to those duties and provisions set forth in sections 1.2, 1.3, 2.1, 2.8, 2.10 and 5.1 of the Agency Agreement.

261.   As a result of SBI and Nelson's breaches of the Agency Agreement, Hanover has suffered damages in excess of $8.5 million.

### AS AND FOR A SECOND CLAIM FOR RELIEF
(Negligence)

262.   Hanover repeats and realleges each and every allegation contained in paragraphs 1 through 261 above.

263.   As surety agents, SBI and Nelson were required to exercise reasonable care and skill in performing their duties, including in the supplying of information to Hanover about Citadel, its owners, principals and key personnel, including Gordon, its projects and its financial condition.

264.   SBI and Nelson failed to meet the standard of care expected of licensed insurance agents in the surety industry.

265.   If SBI and Nelson had exercised appropriate care in the discharge of their duties as agents, Hanover would not have issued surety bonds for Citadel and would not have incurred losses in excess of $8.5 million on those bonds.

266.   As a result of SBI and Nelson's negligence, Hanover has suffered damages in excess of $8.5 million.

## AS AND FOR A THIRD CLAIM FOR RELIEF
(Breach of Fiduciary Duty)

267.   Hanover repeats and realleges each and every allegation contained in paragraphs 1 through 266 above.

268.   SBI and Nelson's acts, errors and omissions all occurred while defendants were acting as Hanover's duly appointed agents and fiduciaries.

269.   As Hanover's agents and fiduciaries, SBI and Nelson, owed fiduciary duties to Hanover, including but not limited to the duties: of utmost loyalty and good faith, to place their duties to Hanover ahead of their own profit making concerns, to be fully candid in their dealings and communications with Hanover, and to exercise the utmost care in the investigation and selection of potential bond principals.

270.   In addition, SBI and Nelson possessed superior knowledge regarding Citadel's affairs, which was not readily available to Hanover, and SBI and Nelson knew that Hanover was acting based upon mistaken and incomplete knowledge, thus imposing on SBI and Nelson a duty to speak truthfully to Hanover, not to mislead Hanover or cause it to act based on misimpressions, and to disclose all material facts to Hanover.

271.   Defendants breached the fiduciary duties which they owed to Hanover, by reason of their wrongful conduct as set forth above.

272.   As a result of SBI and Nelson's breach of their fiduciary duties, Hanover has suffered damages in excess of $8.5 million.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
(Negligent Misrepresentation and Omission)

273.   Hanover repeats and realleges each and every allegation contained in paragraphs 1 through 272 above.

274.   SBI and Nelson and Hanover had a special contractual relationship, pursuant to which SBI and Nelson owed a duty to Hanover to speak with care and to supply truthful and complete information to Hanover in a manner that was not misleading, as they knew that the information was desired for a serious purpose.

275.   SBI and Nelson:

(a)     made or caused to be made false or misleading material representations to Hanover, which should have been known by SBI and Nelson to be false or misleading; and

(b)     caused and acquiesced in the concealment from Hanover of material facts, which they had a duty to disclose to Hanover, amounting to affirmative misrepresentations as to the nature, circumstances, terms, and risks of the transactions being bonded by Hanover.

276.   SBI and Nelson had a duty in the exercise of ordinary care not to make misrepresentations, and not to conceal material information, together with a duty to disclose the information that was withheld, and to correct the misimpression on the part of Hanover that SBI and Nelson had assisted in creating.

277.   SBI and Nelson knew or should have known that in determining whether to issue bonds to Citadel, Hanover intended to rely upon the false or misleading information supplied by SBI and Nelson as well as upon SBI and Nelson's duty to disclose, and not to conceal, material information as to the nature, circumstances, terms, and risks of the transactions being bonded by Hanover.

278.   Hanover reasonably and justifiably relied to its detriment upon the false or misleading information supplied by SBI and Nelson as well as upon SBI and Nelson's duty to disclose, and not to conceal, material information as to the nature, circumstances, terms, and risks of the transactions being bonded by Hanover, by issuing surety bonds for Citadel.

279.   As a result of SBI and Nelson's negligent misrepresentation and omissions, Hanover was injured by being caused to issue surety bonds for Citadel that it would not otherwise have issued.

280.   As a result of the foregoing, Hanover has suffered damages in excess of $8.5 million.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
(Breach of Common Law Duty Owed By Agent to Principal to Report Truthfully)

281.   Hanover repeats and realleges each and every allegation contained in paragraphs 1 through 280 above.

282.   As Hanover's agents, SBI and Nelson owed Hanover a duty to report truthfully and supply correct information with respect to the information requested by Hanover, or supplied by SBI and Nelson to Hanover, and to otherwise make full disclosure to Hanover of all material facts known to them affecting the nature of the risk to Hanover involved in issuing surety bonds for Citadel.

283.   As set forth above, SBI and Nelson repeatedly and pervasively failed to report truthfully or to supply correct information or to otherwise make full disclosure of all material facts known to them affecting the nature of the risk to Hanover involved in issuing surety bonds for Citadel.

284.   As a result of SBI and Nelson's foregoing, Hanover has suffered damages in excess of $8.5 million.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Intentional Misrepresentation)

285.   Hanover repeats and realleges each and every allegation contained in paragraphs 1 through 284 above.

286.   In order to induce Hanover to issue the above-referenced surety bonds for Citadel, SBI and Nelson:

(a)   knowingly made or caused to be made false or misleading material representations to Hanover; and

(b)     knowingly concealed material facts from Hanover, which they had a duty to disclose to Hanover, amounting to affirmative misrepresentations as to the nature, circumstances, terms, and risks of the transactions being bonded.

287.   As a result of the foregoing, SBI and Nelson affirmatively created a misimpression on the part of Hanover, which they had a duty to correct, but failed to do so, in order to induce Hanover to issue surety bonds for Citadel.

288.   At the time these transactions were being consummated, SBI and Nelson knew that Hanover did not have a complete or accurate picture of the risk being undertaken, including Gordon's involvement with Citadel or of the financial condition, character or capacity of Citadel to perform its bonded obligations.

289.   Hanover reasonably and justifiably relied to its detriment on upon the false or misleading information supplied by SBI and Nelson as well as upon SBI and Nelson's duty to disclose, and not to conceal, material information as to the nature, circumstances, terms, and risks of the transactions being bonded by Hanover, by issuing surety bonds for Citadel.

290.   As a result of SBI and Nelson's intentional misrepresentations and omissions, Hanover was injured by being caused to issue surety bonds for Citadel that it would not otherwise have issued.

291.   As a result of the foregoing, Hanover suffered damages in an amount in excess of $8.5 million which it is entitled to recover from SBI and Nelson.

WHEREFORE, plaintiff The Hanover Insurance Company demands judgment in an amount to be demonstrated at trial, in excess of $8.5 million, against defendant Smith Brothers Insurance, Inc. on its first through sixth claims for relief and against defendant James Bartlett Nelson on its second through sixth claims for relief, jointly and severally, together with interest from the date of each loss, the costs and disbursements of this action, and such other and further relief that the Court may deem just and appropriate.

Dated: Jericho, New York
June 11, 2012

> TORRE, LENTZ, GAMELL, GARY
> & RITTMASTER, LLP
> Attorneys for Plaintiff
> The Hanover Insurance Company
>
> By: _____
> Steven H. Rittmaster
> Lawrence S. Novak
> 100 Jericho Quadrangle, Suite 309
> Jericho, New York 11753-2702
> (516) 240-8900

198551 v1

75